J-A26008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO J.L.H., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.R.H., FATHER | : : : : : : : | |
| | : | No. 1008 EDA 2021 |

Appeal from the Decree Entered April 20, 2021
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2020-0075

BEFORE:  BOWES, J., STABILE, J., and McCAFFERY, J.

MEMORANDUM BY BOWES, J.:                **FILED FEBRUARY 4, 2022**

T.R.H. ("Father") appeals from the decree entered on April 20, 2021, that terminated his parental rights to his daughter, J.L.H.  We affirm.

The orphans' court summarized the relevant procedural history as follows:

> J.L.H. was born in Lehigh County on February . . . 2018, to [Father] and J.C.C. ("Mother").[1] [The Lehigh County Office of Children and Youth Services ("CYS")] sought and obtained an Order for Emergency Protective Custody of J.L.H. when she was three days old as a result of the [a]gency's ongoing involvement with Mother regarding four of her other children and the fact that Father and Mother were presenting as a couple at that time.  J.L.H. was briefly placed into foster care until she was adjudicated dependent following a hearing held March 8, 2018.  Shortly after the adjudication hearing, she was moved to the care of a kinship resource, her maternal aunt, R.C. [who is an adoptive resource]. J.L.H. has been in the continuous care of her aunt since that time. J.L.H. is presently three years old.

---

[1] Mother relinquished her parental rights voluntarily pursuant to 23 Pa.C.S. § 2501.

Trial Court Opinion, 4/20/21, at 1-2 (footnotes and citations to record omitted).

The initial permanency goal was reunification. CYS developed several goals for Father and the juvenile court ordered services in order for Father to achieve those goals. However, Father failed to comply with most of the court-ordered services over the course of the dependency proceedings, largely because he was incarcerated for all but seven months of that three-year period. For the majority of his time outside of prison, Father was under the supervision of a drug treatment facility, halfway house, or recovery home. As of the date of the termination hearing, Father had been re-incarcerated for a series of robberies, and his earliest possible release date is April 2022. His maximum sentence expires in 2026.

On September 30, 2020, CYS filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Michael E. Moyer, Esquire, the guardian *ad litem* appointed during the dependency proceeding, acted as legal counsel for then-three-year-old J.L.H.[2]

_____

[2] Attorney Moyer visited his client's pre-adoptive kinship home and advocated in favor of terminating Father's parental rights because it served the child's best interests. *See* N.T., 3/1/21, 110. He filed a brief with this Court in support of the orphans' court's decision to terminate parental rights and expressly adopted "the arguments and reasoning advanced by Appellee, Lehigh County Office of Children & Youth Services." *See* Child's brief, unnumbered at 2. Since J.L.H. was only thirty-seven months old during the evidentiary hearing, there could be no conflict between her best interests and
*(Footnote Continued Next Page)*

During the ensuing hearing via videoconference, CYS called Father to testify as if on cross-examination and presented the testimony of the three caseworkers who were assigned to the family during the course of the agency's involvement in the matter.

We summarize the caseworkers' testimony about Father's court-ordered goals and services as follows. Amanda Scheitrum was assigned the case for approximately eight months between February 8, and October 29, 2018. *See* N.T., 4/1/21 at 45. She testified that Father's goals included continuing mental health treatment, obtaining, and maintaining stable housing and "legal income," cooperating with CYS and reunification services, and attending supervised visitation with J.L.H. *Id*. at 46. He was also instructed to satisfy the terms of his criminal sentencing, attend drug and alcohol counseling, and submit urine screens once he his released from prison. *Id*. at 46-47. Ms. Scheitrum indicated that Father was noncompliant with the court-ordered goals and services during the time that she was assigned to the family. *Id*. at 47-49. She noted that Father's progress was impeded by his periodic arrests during March and July 2018, and his August of 2018 admission into

---

her legal interest. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (no conflict between child's best interests and legal interest if child cannot communicate preference due to the child's young age).

the Keenan House, an addiction treatment center that serves referrals from the criminal justice system.[3] *Id*. at 49-50.

Next, Cody Groller testified that he was assigned to the family between October 2018 and August 2019. *Id*. at 60. He recounted that Father's services had been closed out at that time due to his noncompliance and residence at the Keenan House and a halfway house. *Id*. at 63, 65. By April 2019, Father had progressed to less restrictive housing. *Id*. at 67. Father was maintaining weekly supervised visitation and addressing his substance abuse and unemployment through a criminal probation program. *Id*. 66-67, 73-74. Mr. Groller identified Father's court-ordered goals during that period as addressing substance abuse, satisfying the terms of probation, maintaining employment, obtaining housing, and continuing to participate in supervised visitation. *Id*. at 68. In addition, Mr. Groller informed Father of the benchmarks that he would have to attain in order to reunify with J.L.H. *Id*. at 71. Father indicated an intent to achieve those targets but failed to do so by the time that Mr. Groller stopped working with the family. *Id*. at 71.

Finally, Jessica Vinson testified that she is the current caseworker, having been assigned to the family in August 2019. *Id*. at 79. She noted that Father was responsible for the court-ordered reunification services

---

[3]*See* Keenan House Handbook, https://www.cor.pa.gov/community-reentry/Documents/Handbooks/Region%202/Keenan%20House%20Handbook.pdf

outlined by the other caseworks. *Id*. at 80-81. In addition, he was to continue supervised visitation with his daughter and maintain employment that he had obtained in Breinigsville, Pennsylvania. However, soon after Ms. Vinson inherited the case from Mr. Groller, Father left the recovery house prior to his discharge and terminated contact with CYS until October 2019. *Id*. at 81-83. While away from the recovery house, Father relapsed on crack cocaine and overdosed on prescription medication. *Id*. at 81-83, 93-94, 95. In addition, he participated in a crime spree that resulted in thirteen criminal charges, including three counts of robbery to which he pled guilty. *Id*. at 83, 96-97; Exhibit P-5 at 92-94. The only reunification service that Father is able to engage while incarcerated is visitation, which is performed via telephone and videoconference. *Id*. at 30, 83.

In addition to the forgoing testimony, the agency introduced two exhibits that are identified in the certified record as "P-1 Certified Dependency Juvenile Court Order," and "P-5 Certified Criminal Docket and Sentencing Sheets (for Father)." N.T., 4/1/21, at 3. Of relevance to Father's argument on appeal, CYS's pre-marked Exhibit P-2 was submitted to the orphans' court and opposing counsel along with all the other potential exhibits in preparation for the remote hearing, but it was never introduced during the hearing or admitted into evidence.

On April 20, 2021, the orphans' court entered the above-referenced decree terminating Father's parental rights pursuant to § 2511(a)(1), (2), (5),

- 5 -

(8), and (b). The court's contemporaneously-filed memorandum outlined the basis of its decision. In summarizing the procedural history of the dependency proceedings, the trial court cited CYS Exhibit P-2 to shape Father's court-ordered services. Specifically, the court stated,

> Father was ordered to continue his mental health treatment and follow through with recommendations; obtain and maintain appropriate housing and legal income; obtain a drug and alcohol evaluation and follow through with all recommendations; provide urinalysis to demonstrate sobriety; resolve all criminal issues; and cooperate with reunification services and follow through with all recommendations.

Orphans' Court Opinion, 4/20/21, at 2. Thereafter, without any further references to Exhibit P-2, the orphans' court cogently explained the merits of its decision to terminate Father's parental rights.

Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). With leave of this Court, Father amended his Rule 1925 statement to include a challenge to the orphans' court's citation to Exhibit P-2. We directed the orphans' court to address this issue in a supplemental Rule 1925(a) opinion. On July 17, 2021, the orphans' court filed a laconic supplemental statement explaining that, contrary to Father's contention, "the court's reference to P2 was inadvertent and inconsequential" because it relied upon the witnesses' properly-admitted testimony to outline the court-ordered services and determine Father's failure to comply. Supplemental Rule 1925(a) Statement, 7/16/21, at 2.

Father presents the following questions for our review:

1. Did the trial court commit an error of law by relying upon evidence neither proffered nor admitted at trial?

2. Did the trial court err and abuse its discretion in finding that the [a]gency provided clear and convincing evidence that statutory grounds for termination existed under 23 Pa. C.S. § 2511(a)?

3. Did the trial court abuse its discretion in finding that the [a]gency provided clear and evidence that termination served the needs and welfare of the minor child under 23 Pa.C.S. § 2511(b)?

Father's brief at 4.

Our standard of review requires us to accept the orphans' court's findings of fact and credibility determinations that are supported by the certified record. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). If the record supports the court's findings, we must determine whether the court committed an error of law or abused its discretion. *Id*. An abuse of discretion does not occur merely because the record could support a different result. *Id*. We may find an abuse of discretion "'only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.'" *Id*. (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012)).

Father's argument concerning the orphans' court's reference to Exhibit P-2 in the trial court opinion has two facets. First, he asserts that the mere fact that the orphans' court cited a non-record exhibit "create[d] the potential that the trial court's opinion was impacted by that evidence." Father's brief at 19. Second, he contends that the orphans' court's citation to non-record

evidence cannot be deemed a harmless error. *Id*. at 24. We address the two components *seriatim*.

Father first contends that the trial court opinion was necessarily impacted by the reference to Exhibit P-2. We disagree. Pursuant to Pa.R.A.P. 1925(a), the trial court opinion is intended to provide a brief statement for the reasons for the order on appeal. As the written articulation of the court's rationale, the opinion is not substantive evidence and to the extent that the factual findings that the court actively relied upon were drawn from properly admitted evidence of record, the impact of an errant citation in a trial court is of no moment. Instantly, the orphans' court cited Exhibit P-2 in its opinion to support the straightforward, uncontested proposition that Father had to comply with an array of court-ordered goals and services. Three witnesses testified during the hearing about Father's court ordered goals, including the requirement to maintain supervised visitation, and discussed Father's erratic compliance. Thus, contrary to the crux of Father's assertions, it is clear from the context of the orphans' court's reference to Exhibit P-2 that the court did not invoke the exhibit as substantive evidence that weighed in the outcome of the case.

Moreover, assuming, *arguendo*, that the orphans' court's citation to Exhibit P-2 constituted consideration of evidence *de hors* the record, Father cannot establish prejudice under the facts of this case. Father seeks to be excused from this requirement by claiming that the existing record is

insufficient to determine whether the reference was, in fact, inconsequential. Father's brief at 24. Father's reasoning is as follows: because the trial court omitted the visitation requirement when citing Exhibit P-2, there is no way to determine the gaps in the orphans' court's knowledge. Thus, he posits that, without a review of the exhibit, we are constrained to reverse the termination decree because it is tainted by the trial court's reference. He surmises:

> Without the benefit of Exhibit P2 as part of the record, this Court is . . . unable to determine whether the trial court's citing to that [e]xhibit impacted the outcome. Nor can this Court determine the extent to which the trial court reviewed Exhibit P2, or its contents. This Court therefore cannot determine whether Father was prejudiced by the trial court's viewing thereof.

*Id*. 24.

Father's position is contradicted by the well-ensconced principle that, as the appellant, he was obligated "to ensure that the certified record is complete for purposes of review." *Commonwealth v. Rosado*, 150 A.3d 425, 432 (Pa. 2016) (citation omitted). Indeed, it "is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty.") *Commonwealth v. Bongiorno*, 905 A.2d 998, 1000 (Pa.Super. 2006) (*en banc*). Father could have, but neglected to, seek to supplement the record pursuant to Pa.R.A.P. 1926(b), which provides that a material omission from the record may be corrected by stipulation or court order. Thus, insofar as Father was obliged to ensure that the certified record was sufficient for our appellate review, we reject his

assertion that the termination decree must be reversed because Exhibit P-2 is not included in the certified record.

Equally unpersuasive is Father's reliance upon *In re S.S.*, 252 A.3d 681, 689 (Pa.Super. 2021), for the proposition that our inability to review the missing exhibit warrants reversal. The *In re S.S.* Court confronted a situation where an orphans' court relied upon the merits of an expert report admitted at a prior dependency hearing to make a factual determination against a different expert in a termination of parental rights case involving the same family. In reversing the termination of parental rights, we explicitly determined that it was "clear that the [dependency] report impacted the [orphans'] court's decision." To the extent that we mentioned that the dependency report was not part of the certification record, we observed that we had no way of confirming whether the **merits** of the dependency report supported the orphans' court decision. That confirmation necessarily involves a substantive determination of the merits that is not required in the case at bar. Thus, contrary to Father's assertion, the *In re S.S.* Court did not conclude that the certified record was insufficient to determine whether the missing evidence had an impact on the trial court's decision.

Next, we address Father's assertion that the court's citation to Exhibit P-2 was inherently prejudicial. He contends that, pursuant to our High Court's holding in *In re A.J.R.-H.*, 188 A.3d 1157, 1175 (Pa. 2018), "the fact that there may have been sufficient evidence presented at the hearing to support

termination is not, alone, a basis for finding harmless error." Instead, as phrased by the Supreme Court, "the standard for finding harmlessness in a termination case requires [an appellate court] to conclude that the evidentiary error could not have had any impact upon the [orphans'] court's decision." **Id**. Father posits that, since this Court cannot countenance the orphans' court's reference to Exhibit P-2 unless it is clear that the error could not have had any impact upon the trial court's decision, the harmless error doctrine is inapplicable. That is, referencing the visitation goal's omission from Exhibit P-2, Father argues that "the trial court's citation to non-record evidence creates a factual dispute as to whether its opinion was in some way influenced by that evidence." Father's brief at 27. As this contention simply misstates the significance of the trial court's reference, we reject it for the following reasons.

The crux of this argument is that, since he cannot identify anything that suggests the reference impacted the orphans' court's determination, we are equally precluded from finding that the error could not have had any impact upon the trial court's decision. That is not what **In re A.J.R.-H**., requires. In **In re A.J.R.-H.**, the Supreme Court rejected the orphans' court's rote admission of a collection of exhibits under the business records exception, without proper foundation. As it relates to whether the evidentiary error was harmless in light of the concurrent testimony that CYS adduced at the evidentiary hearing, the High Court stressed, "the standard for finding

- 11 -

harmlessness in a termination case requires us to conclude that the evidentiary error could not have had any impact upon the orphans' court's decision." *In re A.J.R.-H.*, *supra* at 1175. It further explained that, while couched as harmless error, this Court's practice of affirming a trial court decision on any basis supported by the certified record is, in reality, an application of the "right for any reason" doctrine. *Id*. at 1176. Importantly, the Court observed that this doctrine is inappropriate **where an unresolved dispute of fact exists**. Phrased differently, the right for any reason doctrine "may not be used to affirm a decision when the appellate court must weigh evidence and engage in fact finding or make credibility determinations to reach a legal conclusion." *In re A.J.R.-H.*, *supra* at 1176.

As noted, *supra*, there is no dispute of fact regarding Father's court-ordered goals. Three witnesses set forth Father's goals and his failure to comply with any goal with regularity except attending visitations with his daughter. Critically, Father does not dispute this aspect of the witnesses' testimony. Notably, unlike the testimony surrounding the exhibit that was the point of contention in *In re A.J.R.-H.*, the independent testimony that CYS presented to establish the court-ordered goals was not drawn from improper evidence.

Further discussion of the High Court's analysis is warranted. In finding that the trial court's error was not harmless, the *In re A.J.R.-H.* Court noted the witness relied upon the improperly admitted exhibit "[t]hroughout her

testimony . . . to provide answers to questions posed to her regarding the history of CYS's involvement with the family and the parties' compliance with the court ordered services." *Id*. at 1173. However, in contrast to the supporting testimony in *In re A.J.R.-H.*, which was drawn from the improperly admitted exhibit, the three caseworkers' in-court testimony regarding Father's goals in the case *sub judice* was independent from Exhibit P-2 insofar as it was based entirely upon first-hand knowledge of Father's involvement with the agency. In fact, the only reference in the certified record to any witness gleaning information from a document was Ms. Scheitrum's reference to Exhibit P-5, a properly-admitted exhibit relating to Father's extensive criminal history. *See* N.T., 3/1/21, at 57. Accordingly, the properly-admitted testimony was sufficient to cure the orphans' court's inadvertent reference to Exhibit P-2. In short, there is no question of fact that requires this Court to weigh evidence, engage in fact finding, or render a credibility determination to conclude that the reference was harmless. *See In re A.J.R.-H.*, *supra* at 1176. Accordingly, notwithstanding Father's repeated protestations, *In re A.J.R.-H.*, does not mandate reversal in this case.

Having found that Father's first issue fails, we address the merits of the orphans' court's decision to terminate Father's parental rights. Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S. § 2101-2938. It requires a bifurcated analysis, in which the

trial court focuses first on the parent's conduct pursuant to § 2511(a). *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citing *In re R.J.S.*, 901 A.2d 502, 508 (Pa.Super. 2006)). If the court determines that the party seeking termination has established statutory grounds pursuant to § 2511(a), it must then turn its attention to § 2511(b), which focuses on the child's needs and welfare. *Id*. A key aspect of the court's needs and welfare analysis is discerning whether the child has an emotional bond with his or her parent and what effect severing that bond may have on the child. *Id*. The party seeking termination bears the burden of proof under both § 2511(a) and (b) by clear and convincing evidence. *In re C.P.*, *supra* at 520 (citing *In re B.L.L.,* 787 A.2d 1007 (Pa.Super. 2001)).

The trial court terminated Father's parental rights pursuant to § 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of § 2511(a), in addition to § 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Instantly, we find that the certified record supports the orphans' court's decision to terminate parental rights pursuant to § 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-

being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), and (b).

With regard to the termination of parental rights pursuant to § 2511(a)(2), we have indicated the following:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). Significantly, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*,

- 15 -

111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).  Furthermore, "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."  *In re A.L.D.*, *supra* at 340 (internal quotation marks and citations omitted).

In **Adoption of S.P.**, **supra**, our Supreme Court addressed the application of § 2511(a)(2) to incarcerated parents and concluded:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id*. at 828.

Instantly, the certified record reveals a repeated and continued parental incapacity based upon Father's enduring criminal conduct and incarceration over the previous three years, and that incapacity has caused J.L.H. to be without essential parental care.  Hence, the only question currently before us is the propriety of the orphans' court's determination that Father cannot or will not remedy the cause of the incapacity.

In finding that CYS established the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(2), the orphans' court reasoned that Father's continued incapacity due to his criminal conduct and extensive

incarceration has caused J.L.H. to be without necessary parental care and that

Father cannot remedy the causes of the incapacity.   The orphans' court

explained,

> In the present case, Father has been incarcerated for the majority of J.L.H.'s life.   Father's own choices led to his repeated incarceration.   Three years after her adjudication, Father is still unable to resume parental duties.   His repeated incarcerations created a repeated and continuing incapacity pursuant to §2511(a)(2) by which he has caused the child to be without essential parental care, control, or subsistence necessary for her physical and mental well-being for the past three years.   Father's plan to make parole in April 2022 is speculative; he could remain in prison until 2026.   Even if he were to make parole in April 2022, the one-year delay in permanency is unreasonable for a very young child like J.L.H. who has already been without parental care for over three years.   In addition, upon release Father would not immediately be in a position to resume parental rights.   He would need to complete the court ordered services and prove himself ready to appropriately discharge his parental duties.   He is simply unable to remedy his incapacity within a reasonable period of time.
>
> Further, Father has a lengthy criminal history and repeatedly violated the conditions of his parole.   His ability to remain within the bounds of the law and free from incarceration is highly uncertain, notwithstanding his stated intentions to make better choices in the future so he can be present for his daughter. The fact that he committed numerous crimes after his daughter was born is of particular concern, as the effect of those crimes was to cause him to be unable to be present for J.L.H.   Statutory grounds for termination were clearly and convincingly met pursuant to § 2511(a)(2).

Trial Court Opinion, 4/20/21, at 5-6 (citations and footnotes omitted).  In an

accompanying footnote, the trial court summarized, *inter alia*, Father's serial

probation and parole violations, history of substance abuse, and continuing

criminal conduct that led to his most recent incarceration.  ***Id.*** at 6 n.5 (citing

Exhibit P-5). Ultimately, the orphans' court observed, "Father's extensive criminal history lends little comfort to his ability to conform to the requirements of the law once he is finally released from prison." *Id*.

Father argues that the orphans' court erred in terminating his parental rights pursuant to 2511(a)(2) because it "based its decision almost entirely on the length remaining on Father's sentence." Father's brief at 40. He continues that, "[o]utside of the length of his sentence, the facts supporting the trial court's decision were not supported by clear and convincing evidence of record." *Id*. Essentially, Father complains that the orphans' court did not consider any factor other than his potential release date in determining that Father's incapacity is unlikely to be remedied soon. *Id*. at 42.

We first observe that Father's incarceration is clearly relevant. *See In re Adoption of S.P.*, *supra* at 829 (explaining that, once incarceration causes a parental incapacity, "[t]he question, then, becomes whether the parent can remedy the incapacity, which depends to a significant degree on the length of the parent's sentence"). Second, the orphans' court's express statement of rationale belies Father's assertion that its decision rested solely on the expected length of his incarceration. The orphans' court specifically identified Father's extensive criminal history, including multiple violations of probation and parole and examples of recidivism after J.L.H.'s birth, substance abuse, and his post-release obstacles as bases to find that Father cannot remedy the parental incapacity. *See* Trial Court Opinion, 4/20/21, at 5-6. All

of the foregoing considerations, which are supported by clear and convincing evidence in the certified record, relate to Father's choices and the effect of those choices on J.L.H. rather than the fact of his incarceration or anticipated release date. **See e.g.**, Exhibit P-5, Certified Criminal Docket and Sentencing Sheets.

In sum, the record substantiates the orphans' court's conclusion that Father demonstrated a repeated and continued incapacity to parent that has caused J.L.H. to be without essential parental control or subsistence necessary for her physical and mental well-being. **See In re Adoption of M.E.P.**, **supra** at 1272. While Father maintained contact with his daughter, such was insufficient to constitute the parental control J.L.H. requires, and the unfortunate history of this case demonstrates Father either cannot or will not remedy this situation. As we discern no abuse of discretion or error of law in the orphans' court's decision to terminate Father's parental right pursuant to the statutory grounds outlined in § 2511(a)(2), we do not disturb it.

Having determined that the record supports the orphans' court's analysis under 2511(a), we next determine whether termination was proper under § 2511(b). As explained above, § 2511(b) focuses on the needs and welfare of the child, which includes an analysis of any emotional bond that J.L.H. may have with Father and the effect severing that bond. **L.M.**, **supra** at 511. The key questions when conducting this analysis are whether the bond is necessary and beneficial and whether severance of the bond will cause

the child extreme emotional consequences. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa.Super. 2018). It is important to recognize that the existence of a bond, while significant, is only one of many factors courts should consider when addressing § 2511(b). *In re Adoption of C.D.R.*, *supra* at 1219. Other factors include "the safety needs of the child, and . . . the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*.

Father argues that the orphans' court's needs and welfare analysis was faulty because the orphans' court ignored the bond that Father shared with J.L.H. in finding that parental rights could be terminated without detrimental effect. Noting the agency's burden of proof and the orphans' court acknowledgment that a "positive bond" exists between Father and J.L.H., Father contends that CYS failed to present evidence to establish that the potential harm to J.L.H. could be mitigated. *Id*. at 66-67. Hence, he concludes that the orphans' court erred in finding that terminating his parental rights served J.L.H.'s best interest. We disagree.

First, contrary to Father's assertion that the trial court found a positive parent-child bond in this case, the record bears out merely that the court acknowledged, "[s]ome evidence . . . that the child has a positive bond with Father in that she calls him 'Daddy,' asks where he is, and is happy when he calls." Trial Court Opinion, 4/20/21, at 7. The acknowledgment that J.L.H. is aware of Father and appreciates his attention is not tantamount to a

meaningful emotional bond that cannot be severed without detrimental effect. The certified record establishes that Father has an ancillary, as opposed to primary, relationship with his daughter, having failed to perform parental duties during the child's lifetime.

Furthermore, as discussed *supra*, the fundamental question is whether the bond is necessary and beneficial. ***In re Adoption of J.N.M.***, ***supra*** at 944. Instantly, the orphans' court determined that the relationship that J.L.H. shared with Father was not the essential bond that the court was required to protect. In actuality, the indispensable parent-child bond was between J.L.H. and her maternal aunt, R.C., who has fulfilled the parental role for nearly all of the child's life.

The orphans' court explained:

> Even though the child does appear to have a positive bond with Father, her primary bond is with [maternal aunt, R.C.], not with Father. [R.C.] is the only caregiver J.L.H. has ever known. By all accounts, [R.C.] is a loving; appropriate caregiver who meets all of J.L.H.'s needs. **J.L.H.'s needs and welfare are being served in her present situation, living with the only parental figure she has ever known**. Father's desire to have a relationship with J.L.H. is not enough to prevent termination of his parental rights. **The child's strong, positive bond with [R.C.] is the bond that is worth preserving**.

Trial Court Opinion, 4/20/21, at 7 (internal citations omitted, emphases added).

While J.L.H. shares some bond with Father, the facts of this case militate against the conclusion that the bond is necessary or that J.L.H. will suffer extreme emotional consequences due to the severance of the bond. ***See***,

*e.g.*, *Matter of Adoption of M.A.B.*, 166 A.3d 434, 449 (Pa.Super. 2017) (explaining, "a child develops a meaningful bond with a caretaker when the caretaker provides stability, safety, and security regularly and consistently to the child over an extended period of time"). Hence, severing the parent-child bond is not adverse to J.L.H.s best interests.

To the extent that Father complains that CYS did not present expert testimony or a formal bonding assessment, neither of these is required to determine the significance of the parent-child bond or the effect of severing it. *In re D.L.B.*, 166 A.3d 322, 328 (Pa.Super. 2017). Similarly, "the existence of some bond" between a parent and a child "does not necessarily defeat termination of . . . parental rights." *In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super. 2008). The pertinent question is whether the parent-child bond "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id*. Here, the orphans' court noted Father's relationship with J.L.H. and properly considered clear and convincing evidence that J.L.H. was thriving in the care of her adoptive resource. *See In re Adoption of C.D.R.*, *supra* at 1219 (relevant factors include "the safety needs of the child, and . . . the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent"). We discern no error.

Ultimately, the record confirms that, after three years as a dependent child, J.L.H. requires the permanence and stability which Father has demonstrated he cannot or will not provide. Terminating Father's parental

rights will permit J.L.H. to pursue permanence with R.C., the adoptive kinship resource. Although J.L.H. shares a familiar relationship with Father, it was within the trial court's discretion to weigh that companionship against other factors such as J.L.H.'s success with R.C., who encouraged Father's bond with J.L.H. and indicated a willingness to maintain contact with Father, and conclude that the benefits of termination were more significant. The certified record sustains the orphans' court's determination. *See e.g*., N.T., 4/1/21 at 87-88 (Ms. Vinson indicating that J.L.H. is thriving with R.C., who has been the primary parental figure for what amounts to the child's entire life). Thus, we discern no basis to disturb the court's conclusion that termination will best serve J.L.H.'s developmental, physical, and emotional needs and welfare pursuant to § 2511(b).

For all of the foregoing reasons, we find neither legal error nor an abuse of discretion in the orphans' court's decision to terminate Father's parental rights to J.L.H.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/2022